## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

v.          :    CRIM. NO.  24-282

AFEEZ OLATUNJI ADEWALE          :

## GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR UPWARD DEPARTURE AND VARIANCE

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Patrick Brown Assistant United States Attorney, respectfully submits this sentencing memorandum for defendant Afeez Olatunji Adewale, which recommends a sentence of 60 months, substantially above the advisory Guidelines range of 6-12 months.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

On January 4, 2023, a 20-year-old student at Kutztown University, Jack Sullivan, died by suicide.  Sullivan's death was the result of sextortion – a crime in which primarily West African perpetrators pose as young American women on social media sites, trick young American men into providing explicit photographs of themselves, and then blackmail the young men with the threat of releasing those photographs.  An extensive investigation by the FBI, the Abington Township Police Department, and Nigerian authorities identified a Nigerian national, co-defendant Imoleayo Samuel Aina, as the man who had posed as a young woman and relentlessly extorted Sullivan.  Defendant Afeez Olatunji Adewale facilitated that extortion by laundering money in a particularly sophisticated and difficult-to-trace manner.  He worked with a third defendant, Samuel Olasunkanmi Abiodun, to provide compromised American financial account

information to Aina.  Adewale utilized mirror transactions in the Nigerian banking system to compensate Abiodun, and Abiodun also used mirror transactions to compensate Aina.

Following Adewale's identification by the FBI, he was arrested by Nigerian authorities on August 17, 2023.  On August 28, 2023, Adewale was charged in this District by complaint and warrant, and the United States requested his extradition.  Adewale was indicted on wire fraud and money laundering charges by a grand jury on August 7, 2024, and extradited from Nigeria to the United States on February 13, 2026.[1]  On April 13, 2026, Adewale pleaded guilty pursuant to a written plea agreement.  Sentencing is set for July 24, 2026.

## II.    FACTUAL BACKGROUND

Financial sextortion is "a global crisis" characterized by an "exponential increase" in incidents targeting young American men and boys.[2]  Research shows that this surge in sextortion "is directly linked to a distributed West African cybercriminal group called the Yahoo Boys."[3]  The nonprofit Network Contagion Research Institute's report on the group explains:

> The Yahoo Boys, nicknamed after their use of Yahoo.com emails to conduct phishing scams decades ago, are a distributed group of cybercriminals, mostly in Nigeria, who have been associated with many online scams. They are the original "Nigerian Princes", who have shifted in recent years to conduct elderly fraud, fake job scams, romance scams—and now the mass sexual extortion of children for profit. The Yahoo Boys are a major threat actor, actively targeting youth in the United States, Canada, United Kingdom, Australia, Europe, and elsewhere. The Yahoo Boys openly share their tactics and tradecraft among their social media networks, which has resulted in the alarming uptick in sextortion cases and subsequent suicides.

---

[1] Adewale was initially charged with four counts of wire fraud; the government subsequently dismissed three of those counts to conform the charges to the extradition request to the government of Nigeria.

[2] https://www.fbi.gov/news/press-releases/international-law-enforcement-agencies-issue-joint-warning-about-global-financial-sextortion-crisis

[3] https://networkcontagion.us/wp-content/uploads/Yahoo-Boys_1.2.24.pdf at 7 (Attached as Exhibit A, hereinafter NCRI Report)

In this case, defendant Adewale did not actually operate the account used to extort the victim. His co-defendant Aina did that. But Adewale enabled Aina's continuing extortion: along with co-defendant Abiodun, Adewale fed Aina a series of compromised bank accounts and digital payment options. Indeed, in the 24 hours before Sullivan died, Abiodun and Adewale called each other repeatedly on WhatsApp. Aina, in turn, used the payment methods from Abiodun and Adewale to relentlessly press Sullivan for more and more money. Adewale's Mirandized statements make it clear that he knew he was facilitating a scam: when FBI employees asked Adewale whether Abiodun was a Yahoo Boy, he responded, "Hell yeah."

In this case, Adewale helped his co-defendants launder money through complex sets of transactions involving compromised American banking accounts and the Nigerian banking system. These types of transactions are especially difficult for law enforcement to trace, because payments (like the Nigerian bank transfers Adewale sent to Abiodun hours before Sullivan died) do not correspond directly to payments from victims. But even beyond that, searches of Adewale's cellphone and various online accounts revealed that Adewale was himself a prolific scammer. Adewale was, for example, part of a group chat on the encrypted communications platform Telegram with topics of conversation like, "You know how to steal social media accounts with a virus link?" and "Any state DL [drivers' licenses] and SSn [Social Security numbers] with client address For card mailing weekly cash out." He had saved the contact information of a WhatsApp user advertising "I do all US banks and Canada Local banks and credit union" and his phone contained an IRS form 990 for an American individual, documents titled "HOW TO CLONE OR SPOOF A USA PHONE NUMBER" and "how to collect bank details," scripts for inheritance scams, scripts for impersonating members of the U.S. military deployed to Afghanistan and Iraq, and instructions on how to use virtual private networks while

3

evading U.S. banks' anti-fraud measures.  Adewale was, in short, a professional cybercriminal. He personally victimized individuals and enabled others – like co-defendant Aina – to do the same.

### III.    SENTENCING CALCULATION

#### A.    Statutory Maximum Sentence

The Court may impose the following statutory maximum sentences: Count One, wire fraud: 20 years' imprisonment, three years' supervised release, a $250,000 fine, and a $100 special assessment; Count Eight, money laundering conspiracy: 20 years' imprisonment, three years' supervised release; a $500,000 fine, and a $100 special assessment.

In total, the defendant faces 40 years' imprisonment, 3 years' supervised release; a $750,000 fine; and a $200 special assessment.  Full restitution of as much as $3,250 also may be ordered. Forfeiture of any property, real or personal, involved in the violation of law and any such property traceable to such property also may be ordered.  The defendant shall be removed from the United States at the conclusion of his sentence.

#### B.    Sentencing Guidelines Calculation

The government has no objection to the guidelines as calculated in the Final Presentence Investigation Report: a total offense level of ten and a criminal history category of one, and a guideline range of six to twelve months' imprisonment.  PSR ¶ 103.

### IV.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013)

(quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In consideration of the Section 3553(a) factors discussed below, the Government respectfully requests that the Court impose a sentence of 60 months, which is substantially above the sentencing guidelines.

### A.    An Upward Variance Is Warranted

Under the Sentencing Guidelines, the defendant's base offense level is driven by the amount of financial loss.  Section 2B1.1(b)(1) sets out 16 potential loss levels, with increasing penalties as financial loss amounts increase.  The loss amount here, $2,200, does not even reach halfway up the first rung on that loss ladder, and does not result in any enhancement whatsoever.

The resulting base offense level of 12 simply does not capture the harm visited by this crime – and that is before the offense level is adjusted downward under U.S.S.G. § 4C1.1 due to the defendant's lack of criminal history.  PSR ¶ 73.

As described above, the defendant is far from a "zero point offender."  His email accounts and cell phone contain reams of evidence linking him to payments indicative of scams. As one example, Aina provided a Gmail address operated by Adewale to facilitate a payment from Sullivan.  That Gmail account – which was linked to additional Gmail addresses featuring variations of Adewale's true name – contained evidence of dozens of additional payments from many other individuals using US-based payment platforms and banks, including CashApp, Chime, Zelle, PayPal, Wells Fargo, and Woodforest National Bank.  Records from that Gmail account also show Adewale linking and unlinking credit cards from those payment methods, repeatedly purchasing cryptocurrencies, and obtaining access to a virtual private network to mask his internet protocol address.

Defendant Adewale cannot absolve himself of the horrors of this criminal scheme by claiming ignorance of its results.  Yahoo Boys traffic in the pain of their victims, and the defendant knew that blackmail was a common tactic used to scam victims in the United States. Adewale's phone even contained a file titled "How to Start yahoo Blackmailing hot paying update," and he had saved a contact in his phone with the name "Paid Blackmailing tutorial Class full update."  Adewale himself admitted "that he created Facebook and social media accounts using photos of white women to conduct scams."  PSR ¶ 47.  When Adewale chose to enter into this money laundering conspiracy, he knew that he was laundering the proceeds of frauds which inflicted great psychological harm – even if he did not know exactly what those frauds were.

Beyond all of this, an upward variance is appropriate in this case because the loss amount of $2,200 does not even begin to capture the gravity of the offense.  Prior to his death, the victim responded to co-defendant Aina's relentless request for money, "god I don't even have the money in my account anymore" and "I don't even think I have enough for it."  In fashioning a sentence, the Court may consider "not only the pecuniary value of the loss but also such intangibles as its impact on the victim."  *United States v. Poulson*, 871 F.3d 261, 269 (3d Cir. 2017).  The conduct of the members of this criminal conspiracy and the resulting psychological harms were both heinous and foreseeable to the defendant.

**B.      An Upward Variance Is Appropriate under The Section 3553(a) Factors**

**1.      The nature and circumstances of the offense and the seriousness of the offense, respect for the law, and just punishment**

The parties dispute the nature of this offense.  The defendant contends he was a minor player in a crime primarily committed by co-defendant Aina, was not aware of the victim's sextortion, and should receive essentially a time-served sentence because the loss amount in this case does not even register in the Guidelines.  The government's view is quite different: the defendant was a serial fraudster who preyed on the vulnerable, and became involved in this conspiracy because he was, in essence, a professional money launderer with an extensive history of personally scamming victims.  Adewale apparently knew that he was engaged in criminal activity – nine days before his arrest, he had searched for the phrase "apprehend on sight nigerian banks."

Adewale's criminal services were critical to this particular crime, as co-defendant Abiodun turned to Adewale to obtain compromised American bank accounts at the request of co-defendant Aina.  This meant that Aina instructed Sullivan to send money to the accounts

controlled by Adewale  The evidence in this regard is irrefutable: Adewale's cell phone contained screenshots of the compromised American bank accounts, and digital records showing that Abiodun called Adewale approximately 8 times on January 3 and 4, 2023 – the time period during which Jack Sullivan was extorted leading to his death.  Adewale's cell phone also contained evidence of repeated payments to Abiodun through the Nigerian banking system, including a payment of 1,220,000 Nigerian Naira from Adewale's Guaranty Trust Nigeria account to Abiodun's Nigerian Opay Digital Services account.  Adewale later admitted in a Mirandized interview to receiving payments on Abiodun's behalf, retaining a portion of those payments for himself, and forwarding the balance to Abiodun.

### 2. The history and characteristics of the defendant

In crafting a just punishment, it is important for the Court to consider the ways in which Adewale was himself engaged in fraud.  To be clear, the government has only a partial understanding of the scope of Adewale's activities, perhaps because he destroyed evidence of his crimes (ten days before he was apprehended, the defendant searched for "how to wipe my system").  But from what the government has recovered – largely through Adewale's internet search history – two facts about the defendant's criminal activities are clear.

*First*, the defendant intentionally targeted U.S. residents, including non-English speakers. In 2021, he sought a Spanish translation of the phrase "I was born and raised in Louisiana," and in 2022 he sought a Spanish translation of "I live in Nebraska."  Other translation requests show the defendant translating messages into Spanish promising an imminent release of funds by a court.  That would be consistent with a scam, and it is also consistent with the defendant's searches for "supreme court of louisiana logo" and "supreme court of louisiana address."  The defendant also searched for items which would be useful in impersonating an American citizen,

8

like "dogs name in usa."  He also visited the website "Find a MoneyGram Agent Location Near You in the United States."

*Second*, the defendant engaged in a wide range of frauds.  One Google translate request from December 2022 reads, "Please I don't know if you can help me with $100, I need to pay my phone bill and I don't have much with me right now and I don't want to get disconnected." The defendant's phone contained one tutorial titled, "Arab dating format-1" which instructs the reader on how to "Use a very beautiful lady pics using Hijab," send "nude pics" to victims, "bill $1500 for your cousin who had an accident," and also advises "they're crazy about jewelry so request for gold jewellery."  Adewale's internet history, indeed, shows a large number of requests to translate romance scam-related messages into Arabic, like "It was your handsome face that I first fell for. But over the years, your kindness, intelligence, and sense of humor were some of the best things I've discovered. Happy to be with you always. Good morning, my love." It also shows requests for Arabic translations of messages like, "I want to go to Embassy tomorrow morning but I do not have cab fee," "My dad had some properties which was restricted by the government after his death, I want to claim it and use the money that I will get from it to start my own business," and "Please dear, all we need to solve this is just $200. Please my love."

The government respectfully suggests that, against this background, a criminal history of zero understates the defendant's record of past criminal conduct.

### 3.        Deterrence and protection of the public

This case presents a critical opportunity for the Court to protect the public – and especially young people – from the scourge of sextortion, and to undermine the digital marketplaces for money laundering and compromised accounts which enable the crime.  The NCRI Report summarizes how prolific sextortion has become: the National Center for Missing

9

and Exploited Children "reported a 7,200% increase in financial sextortion targeting children from 2021 to 2022," and the Director of the FBI has characterized sextortion as a "global crisis that demands everyone's attention."  The NCRI Report describes how sextortion is exploding in popularity, with shocking numbers of victims:

> [I]n a 2018 nationwide survey in the United States, 5% of teens had reported being a victim of sextortion online. By the summer of 2023, 51% of Gen Z teens and young adults said they or their friends were catfished in online sextortion scams resulting in their intimate photos being used against them—and half (47%) of respondents said they or their friends had been targeted in the past 3 months.

These crimes are so popular because they pay well and are perceived as carrying little risk, propelled by a pervasive sense that foreign threat actors can scam Americans through the internet with near-impunity.  Indeed, this defendant engaged openly with fellow scammers on the platforms WhatsApp and Telegram.  This is a relatively rare case in which online scammers have been de-anonymized, identified, located within their home country, and extradited to face charges in the district where their victim resided.  Such investigations consume huge amounts of time and resources.  The sentence in this case will send a clear message – one way or the other – to individuals in other countries considering whether it is profitable and worth the risk to target young Americans online, or to assist those who do.

### 4.    The need for training, medical care, or other correctional treatment

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."  § 3553(a)(2)(D).  While serving an appropriate sentence, the defendant will have the opportunity to take advantage of educational or vocational training.

### 5.    The guidelines and policy statements, and the need to avoid unwarranted sentencing disparities

As described above, this is a case in which a guideline sentence based purely on the loss amount does not capture the essence of this crime, and a criminal history score of zero does not capture the nature of this defendant. For these reasons, an upward variance to a sentence of 60 months – the same sentence received by co-defendant Abiodun, who engaged in similar money laundering conduct – is appropriate to avoid unwarranted sentencing disparities.

## V.   CONCLUSION

In sum, a careful consideration of all of the sentencing factors supports the imposition of a 60-month sentence.

Respectfully submitted,

DAVID METCALF
*United States Attorney*

*/s Patrick Brown*

PATRICK BROWN
*Assistant United States Attorney*

Dated: July 17, 2025

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Jordan Zeitz, Esq.
Counsel for Defendant

*/s/ Patrick Brown*
PATRICK BROWN
Assistant United States Attorney